C. Warner LITTEN, Paul R. Abrahamson, William Balck, and Dale O. Anderson, Plaintiffs and Appellees,

v.

The CITY OF FARGO, Jon Lindgren, Gib Bromenschenkel, Sid Cichy, Donna Chalimonczyk, and Roy Pedersen, in their official capacity as members of the Board of City Commissioners of the City of Fargo; Frank Fahrlander, in his official capacity as City Auditor of the City of Fargo; Duane Hoehn, in his official capacity as County Auditor for Cass County, North Dakota, Defendants,

and

John Camp, Intervenor,

and

Jacque Stockman, Intervenor Defendant and Appellant.

Civ. No. 9747.

Supreme Court of North Dakota.

June 20, 1980.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for plaintiffs and appellees; argued by H. Patrick Weir, Fargo.

Lashkowitz Law Offices, Fargo, for intervenor defendant and appellant Jacque Stockman; argued by Herschel Lashkowitz, Fargo.

SAND, Justice.

Intervenor Jacque Stockman appealed from a Cass County district court order dated 22 Oct 1979 enjoining the City from

calling a special election on 6 Nov 1979 or any other date based upon the petitions filed for a change in form of city government.

Petitions to change the form of the city government of Fargo, a home rule city, were filed with the city auditor on or about 4 and 5 Oct 1979.

An action was instituted to enjoin the city from holding an election on the proposition set forth in the petitions. After a hearing, the district court found that the petitions and procedures were not in accordance with the laws pertaining thereto and issued an order enjoining the City from conducting an election for a change of government.

The principle issues are: May a home rule city, independent of the general laws relating to cities, select its own form of government and decree its own procedure for changing the form of government, and if so, were the appropriate statutory procedures met by the city of Fargo, or is the city limited in its selection to the procedures and forms of government set out by the legislature?

The parties stipulated to the following pertinent facts:

"8.

"The City of Fargo adopted a Home Rule Charter pursuant to a City election held in 1970.

"9.

"The City of Fargo presently operates under the commission form of government.

"10.

"On October 4 and 5, 1979, Intervenor John Camp filed certain petitions with Defendant Frank Fahrlander. Said petitions asked for a change in the form of city government for the City of Fargo and contained the following language:
'A PETITION TO ESTABLISH REPRESENTATIVE MUNICIPAL GOVERNMENT IN THE CITY OF FARGO

We the undersigned qualified electors of the City of Fargo request that the following change in the form of government question be submitted to the voters of Fargo at the next city-wide election, as provided in Article 12 of the Home Rule Charter of the City of Fargo:
*Change from Commission to Council System of Government*
Shall the City of Fargo change from its organization under the commission system of government and become a city under the council form of government with eleven members?'

"11.

"The petitions were drafted to meet the requirements of Article 12 of the Limited Home Rule Charter of the City of Fargo. Said Article provides as follows:
'*Article 12—Changing the Form of Government*
Changes in the form of government may be proposed by motion of the Governing Body or may be proposed by petitions bearing the signatures of qualified City electors equal in number to at least fifteen per cent of the entire vote cast for executive officer of the City at the preceding regular City Election in which said executive officer was subject to election. Proposals for changing the form of government shall be voted upon at the next City-wide election, provided at least thirty days has lapsed after the motion of the Governing Body or the filing of petitions with the City Auditor.'

"12.

"The petitions were discussed at the regular meeting of the Fargo City Commission on Monday, October 8, 1979. As a result of a record roll-call vote, the question presented on the fact of the petitions was to be placed to a vote of the

city electorate on November 6, 1979, at the same time a county-wide mill levy increase was scheduled."

Herschel Lashkowitz, attorney for the appealing intervenor presented an elaborate historical background on the development of the home rule constitutional and statutory provisions.

In 1966 the electorate approved an amendment to § 130 of the North Dakota Constitution, which now provides as follows:

"Except in the case of home rule cities and villages as provided in this section the legislative assembly shall provide by general law for the organization of municipal corporations, restricting their powers as to levying taxes and assessments, borrowing money, and contracting debts. Money raised by taxation, loan or assessment for any purpose shall not be diverted to any other purpose except by authority of law.

"The legislative assembly shall provide by law for the establishment of home rule cities and villages. It may authorize such cities and villages to exercise all or a portion of any power or function which the legislative assembly has power to devolve upon a nonhome rule charter and which is not denied to such city or village by its own home rule charter and which is not denied to all home rule cities and villages by statute. The legislative assembly shall not be restricted in granting of home rule powers to home rule cities and villages by section 183 of the constitution."

■ Section 130, as amended and approved in 1966, basically removed limitations previously placed upon the legislature relating to cities, directed the legislature to enact laws authorizing home rule, and permitted the legislature to devolve certain powers upon home rule cities. This constitutional provision in itself does not grant any powers to home rule cities. Whatever powers home rule cities may have are based upon statutory provisions.

The North Dakota Legislature in 1969 enacted Ch. 371, which has now been codified as Ch. 40–05.1, entitled *Home Rule in Cities*. Section 40–05.1–06 thereof provides as follows:

"From and after the filing with the secretary of state of a charter framed and approved in reasonable conformity with the provisions of this chapter, such city, and the citizens thereof, shall, <u>if included in the charter and implemented through ordinances</u>, have the following powers set out in this chapter: [underscoring supplied]

.     .     .     .     .

"4. To provide for city officers, agencies, and employees, their selection, terms, powers, duties, qualifications and compensation.

.     .     . "

Stockman, the intervenor-appellant, contended that § 130 of the North Dakota Constitution, Ch. 40–05.1, specifically § 40–05.1–06(4), NDCC, and Article 12 of the limited home rule charter of the City of Fargo, give Fargo very broad powers in determining the form of government it may wish to have and the procedures to be followed.

In support of this contention, he cites a part of § 40–05.1–05, which provides as follows:

" .    .    . <u>Such charter and the ordinances made</u> pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of the city any law of the state in conflict therewith, and shall be liberally construed for such purposes.    .    .    . " [Underscoring supplied.]

In *City of Fargo v. Fahrlander*, 199 N.W.2d 30 (N.D.1972), the court paraphrased this section without further comment.

■ We are convinced the court, by paraphrasing the statutory provisions of § 40–05.1–05 in *Fahrlander*, did not intend to imply that any and every ordinance the city may pass would supersede any state law which was in conflict therewith. The supersession provision set out in § 40–05.1–05, NDCC, has limited and qualified application.

■ It becomes somewhat evident that the language in § 40–05.1–05, NDCC, permitting a city ordinance to supersede state law where there is a conflict has reference only to those powers given to the city under § 40–05.1–06, because in certain instances the legislature specifically required compliance with the special laws. Subsection 11 of § 40–05.1–06, NDCC, specifically provides that the zoning, planning and subdividing outside the city limits may be as permitted by state law, and subsection 14 provides that the boundary limits of the city and the annexation and deannexation of territory must conform with state law. This clearly indicates that the legislature intended the cities to exercise broad plenary powers in those items specified under § 40–05.1–06, except where specifically provided that these powers may be exercised only by conforming or complying with state law. It necessarily follows that in order to determine what broad powers were given to home rule cities we must examine the various provisions of § 40–05.1–06. If the authority or power to enact an ordinance on a specific subject is not found in § 40–05.1–06 or in Ch. 40–05.1, or some other comparable statute, then a strong presumption exists that the city will be governed by the laws generally applicable to cities.

■ In *City of Fargo, Cass County v. Harwood Township*, 256 N.W.2d 694 (N.D. 1977), we basically concluded that a city, whether home rule or otherwise, has no inherent power except as expressly granted or necessarily implied from the grant by the Legislature and without such grant it has no more right than any other corporation to condemn property. This statement generally applies to any activity of the city. The power and authority of a city must be found either in a constitutional or statutory provision.

Section 40–05.1–10, NDCC, provides that the general election laws for cities are to be followed for calling and holding city elections, except all qualified voters shall be eligible to vote at elections and the form of ballot shall be prescribed by the charter commission on the home rule question.

Section 40–05.1–12 provides that all powers granted to any city by general laws are preserved to each home rule city respectively and are granted to the home rule cities.

■ We conclude that the supersession provision set out in § 40–05.1–05, NDCC, applies only to those powers set out in § 40–05.1–06, NDCC, provided they are also included in the charter and implemented by ordinance.

■ It is not sufficient merely to examine the subsections of § 40–05.1–06, NDCC, to determine what powers the city of Fargo, a home rule city, may have. To make this determination it is also necessary to review the charter to determine if those powers are included in the charter, and if they are it then becomes necessary to determine if they were implemented by an ordinance. It therefore follows that if the powers are not stated in the charter, or if they are stated in the charter but are not implemented by ordinance, the home rule city may not avail itself of the powers enumerated in § 40–05.1–06, NDCC, but would be governed by the statutes applicable generally to all cities. This conclusion is confirmed by the last unnumbered paragraph of § 40–05.1–06, which, in part, provides as follows:

"The statutes of the state of North Dakota, so far as applicable, shall continue to apply to home rule cities, except insofar as superseded by the charters of such cities or by ordinance passed pursuant to such charters."

We have taken judicial notice of and examined the charter filed in the Secretary of State's office by the City of Fargo. The first unnumbered paragraph of Article 3, entitled *Powers of City*, provides as follows:

"The City shall have all powers granted to municipal corporations by the constitution and laws of this state and by this charter, together with all implied powers necessary to carry into execution all powers granted.

"Among its enumerated powers, which may be implemented by ordinance subject to limitations specified in this charter, shall be the following:"

This provision is in complete harmony with and supports our conclusion reached earlier herein.

We also find that Article 3 of the charter generally tracks the language and powers found in subsections 1 through 15 in § 40–05.1–06, NDCC. However, we note that in subsection (d) of Article 3 of the charter the word "duties" does not appear as it does in subsection (4) of § 40–05.1–06. Whether this is deliberate or an oversight we do not know. In any event, this is not significant to our conclusion.

Except for Article 12 which has been quoted earlier herein, the limited home rule charter of the City of Fargo contains no provision relating specifically to "changing the form of government."

We have examined the ordinance code of the city of Fargo, entitled *Fargo Revised Ordinances of 1965*, together with the 1974 pocket supplement, and we find that the only reference to change in form of government is in § 1–01–06 entitled "Change in Form of Government—omitted" with the notation: "Note: This former section related to change from the 'city manager' to 'commission' form of government." The 1974 supplement does not indicate any change to this section.

Neither party has called to our attention any city ordinance which provides for a change of form of government and our research does not disclose that the city of Fargo has adopted an ordinance setting forth either the procedures to be followed in changing the city form of government or the forms of government that may be used by the city of Fargo.

However, Ch. 4, relating to officers and duties in the ordinances of the city of Fargo, spells out the duties generally for the commissioners of the city and the various city officers and specifies whether they shall be appointed or elected. We have not found any ordinance which could be considered as implementing § 40–05.1–06(4), NDCC.

■ It was contended and argued by the intervenor-appellant that the city of Fargo had the authority to change its form of government to any form it desired by virtue of subsections (4) and (6) of § 40–05.1–06, NDCC. But be that as it may, from our examination it appears that subsections (4) and (6) of § 40–05.1–06 were not implemented by any city ordinance so as to put into operation the provisions of § 40–05.1–05, NDCC. Consequently they may not be relied upon as authority to change the form of government of the city to any form desired or to be determined later by the city. If the contentions of the appellant were correct, the city could adopt "a one-man rule" for a form of government. With our background and history, particularly the many, many hardships and sacrifices endured to make our form of government available, we doubt that the legislature would even grant such authority. Our court has consistently held that the statutes must be construed to avoid ludicrous and absurd results. *State v. Mees*, 272 N.W.2d 61 (N.D.1978); *State v. Jelliff*, 251 N.W.2d 1 (N.D.1977); *Pollock v. McKenzie County Public School District No. 1*, 221 N.W.2d 521 (N.D.1974); and *Hughes v. State Farm Mutual Insurance Co.*, 236 N.W.2d 870 (N.D. 1975).

■ If subsections (4) and (6) of § 40–05.1–06 were considered solely upon the independent language without regard to any other statutory provisions, an argument could be made that the language is doubtful and could be construed to conform with the intervenor's contention, but statutes, and particularly subsections, are not construed or interpreted in isolation. All pari materia statutory provisions are to be considered and given meaningful effect without rendering one or the other useless. *Edgeley Education Association v. Edgeley Public School District No. 3*, 231 N.W.2d 826 (N.D. 1975).

Keeping this principle in mind, we examine other statutory provisions that have a bearing upon our interpretation and construction of the pertinent provisions of law [subsections (4) and (6)].

The legislature, in § 40–01–01, NDCC, set out various definitions, including the following:

"In this title, unless the context or subject matter otherwise requires:

. . . . .

"2. 'Governing body' shall mean the city council or the board of city commissioners, as the case may be, of a municipality concerned or affected;

"3. 'Executive officer' shall mean the mayor in council cities or the president of the board of city commissioners in commission cities;"

■ The foregoing definitions apply to Ch. 40–05.1 and from it we must conclude that the term "city officers" as found in § 40–05.1–06(4) is not the executive or "governing body" but is intended to refer only to individual officers, either elected or appointed.

We cannot overlook the fact that the legislature by statute provided for the various forms of government a city may have and the procedures to be followed in changing the form of government. A change from council to commission form is found in Ch. 40–03.1, NDCC, and the change from commission to council form is found in Ch. 40–04, NDCC.

The legislature obviously was aware of the detailed procedure required to accomplish an orderly change of government. It also realized the necessity for specifics of each form of government that a city may have, and accordingly enacted appropriate legislation (Chapters 40–03.1, 40–04, 40–08, 40–09, and 40–14, NDCC). This serves as an indication of what would be expected to be set forth in the charter and implemented by ordinance provided the powers were given to the cities by the legislature. Under these statutory provisions where a change in the form of government is submitted to the electorate they will be adequately informed to know what they are voting on. This is essential so that an electorate may make an informed choice.

This lack of information is precisely what is missing under the proposal (petition) in question and would be missing even if the delegation charter and ordinance requirements discussed earlier herein would have

been met. Significantly, the eleven-man council form of government under the statutory provisions only applies to a modern council form of government and is not available to an ordinary council form of government.

To permit a city to submit to the electorate a change of government, and if approved, later determine what shall comprise such government and set up the details for electing, assigning duties, and other related items for the officers of the governing body, would be like asking the people to buy a pig in a poke.

In our view, to permit a conclusion that an ordinance supersedes a state law, providing the charter and implementing ordinance requirements have been met, it is not only essential that the power given to the city by the legislature is clearly expressed or necessarily implied from the grant but also that it conflicts with the laws generally applicable to cities.

■ For the reasons discussed earlier herein we conclude that the legislature did not intend, and the statutory provisions do not give, home rule cities the authority to select any form of government it may desire. Our conclusion is supported and evidenced by the lack of an orderly procedure to be followed in the change of government and the absence of clear or necessary implied authority under Ch. 40–05.1, NDCC. We conclude that in the matter of changing the form of government the legislature intended home rule cities to be governed by those laws applying to cities generally.

The judgment of the trial court is affirmed. Costs assessed to neither party.

ERICKSTAD, C. J., and PAULSON and PEDERSON, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I concur in the result and much of what Justice Sand has written concerning this matter. I agree that before a city may exercise particular home-rule authority that authority must have been granted to home-rule cities by the Legislature. Although I

concede an argument can be made that if the Legislature had intended a home-rule city to have unrestricted authority to change the form of government of the city the Legislature would have expressly so stated, we know that what appears to be clear and concise to one person may seem vague and ambiguous to another. In enacting Section 40–05.1–06(4), N.D.C.C., the Legislature authorized home-rule cities to "provide for city officers, . . . their selection, terms, powers, duties, qualifications, and compensation." Section 40–15–01, N.D.C.C., provides, in part, that in cities operating under the commission system of government "The following officers" are to be elected: a president of the board of city commissioners and four city commissioners. Section 40–14–01, N.D.C.C., provides, in part, that in cities operating under the council form of government "The following officers" are to be elected: a mayor and the aldermen required under the particular form of mayor-council government adopted by that city. There is thus an indication that the Legislature considered the members of the governing body of a city to be "officers" of that city. I believe an argument can be made that the Legislature by enacting Section 40–05.1–06(4), N.D.C.C., has granted to home-rule cities the right to select their own form of government, independent of the statutory restrictions applicable to cities that have not adopted a home-rule charter. It would, of course, be preferable if the Legislature had been more specific in expressing its intent.

Despite this possible interpretation of Section 40–05.1–06(4), and despite the provision in the Fargo home-rule charter permitting that city to change its form of government, no ordinances have been drawn to our attention which implement that provision. As Justice Sand has noted, it is not sufficient that the Legislature has granted home-rule cities certain powers. Those powers must also be included in the city charter and "implemented through ordinances" in order to be operative.

Perhaps because there are no ordinances implementing the charter provision for a change in the form of government the proposal in the petitions was inexact and indefinite. It provided no time frame within which the change in the form of government was to be implemented. It contained no provision as to the method of selection of the aldermen, i. e., at large or by wards; it contained no provision as to whether or not there was to be a mayor or, if there was to be a mayor, how that officer was to be selected. Although we were told at oral argument these details could be prescribed by ordinance if the electorate approved the change in form of government, I cannot agree with that concept for two reasons: First, the electors are entitled to know the details of what they are asked to approve or reject before the election—not after the fact. Second, to leave to the present city government the responsibility of specifying the details of the change in the form of government can only lead to further legal actions to determine whether or not the governing body has acted in accord with the dictates of the electorate as to time and manner of changing the form of city government. The issue proposed is just too indefinite to inform the electorate of the city of the changes in form of government which are proposed.